**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| BIKASH GURUNG, | § | |
| *Petitioner* | § | Case No.  SA-25-CA-01614-XR |
| | § | |
| v. | § | *Consolidated with*: |
| | § | SA-25-CA-01739-XR |
| WARDEN, SOUTH TEXAS ICE | § | |
| PROCESSING CENTER *et al.* | § | |
| *Respondents* | § | |

## ORDER GRANTING PETITIONS FOR WRIT OF HABEAS CORPUS AND MOOTING MOTION FOR TEMPORARY RESTRAINING ORDER

On this date, the Court considered Bikash Gurung's Petitions for a Writ of Habeas Corpus filed in these consolidated cases and motion for a temporary restraining order filed in the Member Case (No. SA-25-CV-1739-XR, ECF No. 2), the Federal Respondents' response filed in the Lead Case (ECF No. 5), and Petitioner's reply in the Member Case (ECF No. 9). After careful consideration, the petitions are **GRANTED**. It is **ORDERED** that:

1.      Respondents are **DIRECTED** to **RELEASE** Petitioner Bikash Gurung (A212-179-775) from custody, under conditions no more restrictive than those in place before the detention at issue in this case, to a public place by **12:00 p.m.** on **January 8, 2026**.

2.      Respondents must **NOTIFY** Petitioner's counsel by email[1] of the exact location and time of Petitioner's release as soon as practicable and **at least two hours before his release;**

3.      Respondents shall **FILE** a status report **no later than 5:00 p.m. January 8, 2026**, confirming that Petitioner has been released under conditions of release no more restrictive than those in place prior to the detention at issue in this case.

---

[1]Georgia Santos Laurent, georgia@sanlaurentlaw.com, (786) 781-0781.

**BACKGROUND**

I.    **Factual Background**

Petitioner Bikash Gurung (A212-179-775) is a noncitizen who has been detained at the South Texas ICE Processing Center in Pearsall, Texas, since January 2025. Member Case, ECF No. 1 ¶ 1.

Mr. Gurung was born in a refugee camp in Nepal and has never been recognized as a Nepali citizen. *Id.* ¶ 14. Nepal does not grant citizenship based on place of birth and instead follows a parentage-based system requiring at least one Nepali citizen parent. *Id.* Because Mr. Gurung's parents were born in Bhutan, and Nepal does not issue birth certificates to children born in refugee camps to non-Nepali parents, he has never been issued a birth certificate or passport by any country. *Id.*

On April 28, 2009, Petitioner entered the United States as a lawful permanent resident under category RE8, as the child of a refugee who adjusted status, and he has lived in the United States since then. *Id.* ¶ 15. His parents later naturalized as U.S. citizens, and his then-minor siblings automatically derived citizenship from their parents. *Id.* Petitioner was unable to derive citizenship, however, because he was over eighteen years old when his parents were naturalized. *Id.* Petitioner's wife and son are both U.S. citizens. *Id.* Thus, Petitioner is the only non-citizen in his immediate family.

On March 25, 2022, an Immigration Judge ordered Mr. Gurung removed after determining that a criminal conviction in 2014 rendered him deportable under the Immigration and Nationality Act. *Id.* ¶ 16. In July 2022, both the Embassy of Nepal and the Consulate of Bhutan denied travel document requests ("TDRs") submitted on his behalf because he was not a citizen of either country. *Id.* ¶¶ 13–14.

In August 2022, after determining there was not a significant likelihood of removal in the reasonably foreseeable future, ICE released Petitioner from custody under an Order of Supervision. *See* ECF No. 2-2 at 15. Implicit in the decision to release Petitioner under supervision was a finding that he was nonviolent and would remain so if released, that he was not likely to threaten the community if released, that he was not likely to violate the conditions of his release, and that he did not pose a flight risk. *See* 8 C.F.R. § 241.4(d)(1) (permitting the release of a noncitizen "if the [noncitizen] demonstrates to the satisfaction of the Attorney General or her designee that his or her release will not pose a danger to the community or to the safety of other persons or to property or a significant risk of flight pending such [noncitizen]'s removal from the United States."); 8 C.F.R. § 241.4(e) (listing the criteria for release as including a determination that the noncitizen "is not likely to pose a threat to the community following release" and "does not pose a significant risk of flight if released"). Since his release, Petitioner consistently attended required check-ins and complied fully with all reporting obligations. Member Case, ECF No. 1 ¶ 4. Before his re-detention, he worked a gas station manager for two and a half years. *Id.* ¶ 18.

The Order of Supervision required Petitioner to, among other things, provide proof of requests for a travel document. ECF No. 2-2 at 15–17. In February 2023 and June 2024, Petitioner updated ICE as to new inquiries he had conducted to assist in his removal. ECF No. 5-1 ¶¶ 19–20 (noting pending inquiries with Bhutan, the United Kingdom, and India).

On January 28, 2025, ICE arrested Petitioner at his home and took him into ICE custody. *Id.* ¶¶ 21–22. Nearly a year later, ICE has never supplied a reason for revoking Petitioner's supervised release or afforded him an opportunity to respond to the revocation. Member Case, ECF No. 1 ¶ 19.

## II.    Procedural History

Petitioner originally filed a *pro se* petition in the Lead Case (ECF No. 1) in November 2025, to which the government responded (ECF No. 5). Then, in December 2025, Petitioner filed a second habeas petition, this time represented by counsel. *See* Member Case, ECF No. 1; *see also id.*, ECF No. 2 (TRO motion). After the Court consolidated the cases, the government elected to rely on its previous response in the Lead Case in both matters. *See* Member Case, ECF No. 8.

Petitioner asserts that the government has violated his due process rights (1) by failing to comply with its own regulations governing his revocation of his supervised release and removal to a third country, *Accardi v. Shaughnessy*, 347 U.S. 260 (1954), and (2) by continuing to detain him even though his removal is not reasonably foreseeable. *Zadvydas v. Davis*, 533 U.S. 678 (2001). Member Case, ECF No. 1. As relief, he asks the Court to order his immediate release.

In response, the government argues that the Court lacks jurisdiction over Petitioner's claims and that Petitioner's detention comports with the requirements of due process and applicable regulations. ECF No. 5. In support of its response, the government proffers the declaration of a Celestina Pena, a Supervisory Detention and Deportation Officer for ICE in the San Antonio, Texas Field Office of Enforcement and Removal Operations ("ERO"). ECF No. 5-1, ("Pena Decl."). In her declaration, Pena sets out the history of Petitioner's removal proceedings based on her review of electronic records, the A-file, and information from "other [Department of Homeland Security ("DHS")] employees" and "employees of DHS contract facilities." *Id.* ¶ 2.

Pena also outlines the efforts the government has allegedly undertaken to secure Petitioner's removal since his re-detention in January 2025. Inexplicably, the government acknowledges that it did not even review Petitioner's A-File until he had been detained for nearly a month "to obtain more information regarding nationality, citizenship, and heritage"—all

4

information that could and *should* have been obtained *before* Petitioner's re-detention. ECF No. 5 at 2–3; *see also* Pena Decl. ¶¶ 23–24.

Then, the government decided to submit a TDR to Nepal, which had denied Petitioner's requests in 2022 because he was not a citizen. *See* Pena Decl. ¶¶ 27–28, 30. Unsurprisingly, in July 2025, the Embassy of Nepal denied the new TDR because Petitioner was unable to provide a passport number on the passport application. *Id.* ¶ 33. A week later, ICE-HQ requested a denial letter from the Embassy and access to Nepalese databases to search for a passport/citizenship number for Petitioner. *Id.* ¶¶ 34–35. In October 2025, Petitioner informed ICE that he would like to be removed to a third country because—as should have been abundantly clear to ICE by then— he does not possess documents to Nepal. *Id.* ¶ 36. Later that month, Petitioner informed ICE that he would like to be removed to Mexico. *Id.* ¶ 37. Still, "ICE did not pursue a removal to Mexico at that time" because of its unyielding position that "the removal process with Nepal was still ongoing." *Id.* Finally, on December 8, 2025, ICE-HQ accepted what had been apparent since July 2022—the Nepalese embassy would not issue Petitioner a travel document. *Id.* ¶ 38. On December 11, 2025, ICE submitted a Request for Acceptance of Alien to Mexico for a possible third-country removal. *Id.* ¶ 39. On the same date, the Consulate of Mexico denied the request. *Id.*

Pena maintains that "ERO is in the process of seeking removal to additional third countries, to include but are [sic] *not limited to*, Canada and the United Kingdom." *Id.* ¶ 40 (emphasis added). The declaration does not state that ICE has ever requested that Petitioner apply for travel documents to any of these countries. In reply, Petitioner challenges the declaration as hearsay and otherwise insufficient to establish that the government has complied with its own regulations or that Petitioner's removal to a third country is reasonably foreseeable. Member Case, ECF No. 9.

**LEGAL STANDARD**

A habeas petitioner must show they are "in custody in violation of the Constitution or laws or treaties of the United States." *Villanueva v. Tate*, No. CV H-25-3364, 2025 WL 2774610, at *4 (S.D. Tex. Sept. 26, 2025) (quoting 28 U.S.C. § 2241(c)(3)). The petitioner "bears the burden of proving that he is being held contrary to law; and because the habeas proceeding is civil in nature, the petitioner must satisfy his burden of proof by a preponderance of the evidence." *Id.* (quoting *Skaftouros v. United States*, 667 F.3d 144, 158 (2d Cir. 2011); also citing *Bruce v. Estelle*, 536 F.2d 1051, 1058 (5th Cir. 1976)). "A court considering a habeas petition must 'determine the facts, and dispose of the matter as law and justice require.'" *Id.* (quoting 28 U.S.C. § 2243).

## I.    The Court has Jurisdiction over the Petition

The government contends this Court lacks jurisdiction over Petitioner's due process claims because they are "inextricably intertwined with ICE's unreviewable authority to execute a final order of removal." ECF No. 5 at 4 n.4. But Petitioner does not challenge his removal or the government's ability to detain him in the time necessary to effect his removal. Rather, he challenges the government's authority to hold him in detention *indefinitely* while it tries to find a third country that will accept him. These types of claims are not barred by 8 U.S.C. § 1252(g). *See Demore v. Kim*, 538 U.S. 510, 516–17 (2003) (citing 28 U.S.C. § 2241(c)(3)); *Baez v. Bureau of Immigr. & Customs Enf't*, 150 F. App'x 311, 312 (5th Cir. 2005) (per curiam) (courts retain the power to hear statutory and constitutional challenges to immigration detention when those claims do not challenge the final order of removal).

Similarly, the Court recognizes that it has no jurisdiction to review a "decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland

6

Security." 8 U.S.C. § 1252(a)(2)(B)(ii); *see also* 8 C.F.R. § 241.4. (permitting ICE officials to decide to revoke supervised release "in the exercise of discretion").

But Petitioner does not challenge the purported decision to revoke his Order of Supervision.[2] Instead, he challenges the manner in which the government has re-detained him, which he contends was done without due process and in violation of ICE's own regulations. "Nothing in 8 U.S.C. § 1252(a)(2)(B)(ii) prevents the Court from considering [Petitioner]'s challenge to the manner in which the government revoked his Order of Supervision or considering whether the government followed its own regulations in doing so." *Villanueva*, 2025 WL 2774610, at *5 (citing, *inter alia*, *Zadvydas*, 533 U.S. at 687–88 (holding that a § 2241 petition is the proper vehicle for a petitioner to use to challenge the legality and constitutionality of post-removal-period detention)); *see also Oyelude v. Chertoff*, 125 F. App'x 543, 546 (5th Cir. 2005) (courts have jurisdiction to review detention "insofar as that detention presents constitutional issues, such as those raised in a habeas petition").

In short, the Court has jurisdiction to review Petitioner's claims that his detention violates his statutory and constitutional rights to due process.

## II.     Petitioner's Detention Violates His Due Process Rights

Petitioner argues that he is entitled to relief for two reasons: First, he argues the government has violated its own regulations governing his revocation of release and removal to a third country, in violation of procedural due process. *See Accardi v. Shaughnessy*, 347 U.S. 260 (1954). Second, he argues his detention violates 8 U.S.C. § 1231(a)(6) and is illegal under *Zadvydas v. Davis*, 533 U.S. 678 (2001), because his removal is not reasonably foreseeable.

---

[2] The Court refers to this as a "purported" revocation because the government has not provided a copy of an order revoking supervision to either Petitioner or the Court. Without such evidence, nothing before the Court demonstrates that such an order exists.

### A.      Petitioner Was Detained in Violation of Mandatory Government Procedures

On January 28, 2025, ICE detained Petitioner at his home—without written notice of revocation, without the mandatory informal interview, and without any individualized finding or signature by an official with delegated revocation authority—and has provided no country-specific reasonable-fear process for any third-country removal. Petitioner asserts that, in doing so, the government has violated its own mandatory procedural requirements in violation of his Fifth Amendment due process rights. *See* Member Case, ECF No. 1 at 7, 10–12 (citing 8 C.F.R. §§ 241.4, 241.13); *id.*, ECF No. 9 at 3–6.

The statutes and regulations governing immigration and removal proceedings afford important procedural safeguards to detainees. *See United States v. Caceres*, 440 U.S. 741, 760 (1979). For Petitioner's detention to be constitutional, the government must have complied with both the applicable statutory provisions and its own regulations. *Id.* (when federal regulations afford individual rights and protections, the Supreme Court has insisted on requiring an agency's compliance with its own regulations).

"Under deeply rooted principles of administrative law, not to mention common sense, government agencies are generally required to follow their own regulations." *Villanueva*, 2025 WL 2774610, at *7 (quoting *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020); *see also Gulf States Mfrs., Inc. v. Nat'l Lab. Relations Bd.*, 579 F.2d 1298, 1308 (5th Cir. 1978) ("It is well settled that an Executive Agency of the Government is bound by its own regulations, which have the force and effect of law, and the failure of an agency to follow its regulations renders its decision invalid."); *Gov't of Canal Zone v. Brooks*, 427 F.2d 346, 347 (5th Cir. 1970) (per curiam) ("It is equally well established that it is a denial of due process for any government agency to fail to follow its own regulations providing for procedural safeguards

8

to persons involved in adjudicative processes before it."). "Multiple courts have held that the government's failure to follow its own immigration regulations may warrant the release of a detained noncitizen." *Villanueva*, 2025 WL 2774610, at *7 (collecting cases); *see also id.* ("The government's position that it can choose, based on a change in administration, not to comply with its own regulations is unprecedented.").

Petitioner alleges violations of the statutes and regulations governing (1) the purported revocation of his Order of Supervision and (2) his right to challenge the revocation.

### 1.      Revocation of Release

Once Petitioner was released from detention under an Order of Supervision, the revocation of that release was subject to the provisions of 8 C.F.R. § 241.4(*l*)(2). That subsection limits the exercise of the discretion to revoke an Order of Supervision:

> Release may be revoked in the exercise of discretion when, in the opinion of the revoking official:
>
> (i)  The purposes of release have been served;
>
> (ii) The [noncitizen] violates any condition of release;
>
> (iii)It is appropriate to enforce a removal order or to commence removal proceedings against a[noncitizen]; or
>
> (iv)The conduct of the [noncitizen], or any other circumstance, indicates that release would no longer be appropriate.

8 C.F.R. § 241.4(*l*)(2).

Moreover, only certain government officials explicitly identified in the federal regulations have the authority to revoke an Order of Supervision:

> The Executive Associate [Director] shall have authority, in the exercise of discretion, to revoke release and return to [ICE] custody a [noncitizen] previously approved for release under the procedures in this section. A district director may also revoke release of a [noncitizen] when, in the district director's opinion, revocation is in the public interest and

circumstances do not reasonably permit referral of the case to the Executive Associate [Director].

8 C.F.R. § 241.4(*l*)(2).

Petitioner asserts that the Government has offered no explanation for revoking his Order of Supervision. Member Case, ECF No. 1 at 7. Indeed, Pena's declaration contains no facts concerning whether Petitioner's Order of Supervision has ever been revoked, much less whether it has been legally revoked for a permissible reason by an order signed by an official with the requisite authority. *See generally* Pena Decl. Instead, it states only that Petitioner was arrested "at his place of residence and placed [into] in immigration custody" on January 28, 2025. *Id.* ¶ 22.

In the absence of some evidence that Petitioner's Order of Supervision was lawfully revoked by someone with the authority to do so and for a reason lawfully permitted, the Government has failed to show that it afforded Petitioner with due process in connection with the purported revocation of his Order of Supervision. The record before the Court shows that Petitioner was arrested and re-detained in violation of the statutes and regulations that govern the revocation of a lawful Order of Supervision.

### 2. Right to Challenge Revocation of Release

Petitioner also contends that the government violated his due process rights by violating the requirements of 8 C.F.R. § 241.4(*l*)(1). See Member Case, ECF No. 1 at 7. That section provides:

> Any [noncitizen] . . . who has been released under an order of supervision or other conditions of release who violates the conditions of release may be returned to custody . . . . *Upon revocation, the [noncitizen] will be notified of the reasons for revocation of his or her release or parole. The [noncitizen] will be afforded an initial informal interview promptly after his or her return to Service custody to afford the [noncitizen] an opportunity to respond to the reasons for revocation stated in the notification.*

8 C.F.R. § 241.4(*l*)(1) (emphasis added).

10

Petitioner asserts—and the government does not appear to dispute—that he has never been provided with a notification of the revocation of his Order of Supervision, has never been advised of the reasons for the purported revocation, and has never been provided with the informal interview required by § 241.4(*l*)(1). Member Case, ECF No. 1 at 7; *see generally* Lead Case, ECF No. 5. The government's failure to identify the reason for the revocation in even a cursory manner for the Court is good circumstantial evidence that ICE has not explained the revocation to Petitioner. The government does not meaningfully address Petitioner's claim that his detention violated his due process rights by failing to comply with its own regulations, much less proffer any evidence demonstrating its compliance. *See* ECF No. 5 at 7.

### B.    Petitioner's Removal is Not Reasonably Foreseeable.

Petitioner argues that his detention is illegal under *Zadvydas v. Davis*, 533 U.S. 678 (2001), because his removal is not reasonably foreseeable. "[T]he Government ordinarily secures [a noncitizen]'s removal during" the ninety days following a final order for the person to be removed. *Zadvydas*, 533 U.S. at 682; 8 U.S.C. § 1231(a)(1). During that ninety-day "removal period," the person subject to removal is typically detained. *Zadvydas*, 533 U.S. at 682. Beyond that point, the Government may in some situations continue detaining them for as long as is "reasonably necessary" to secure their removal. *Id.*; 8 U.S.C. § 1231(a)(6). But, under *Zadvydas*, "once removal is no longer reasonably foreseeable, continued detention is no longer authorized." 533 U.S. at 699.

*Zadvydas* recognized a "presumptively"—not categorically—reasonable period of detention. 533 U.S. at 699 (emphasis added); *Villanueva*, 2025 WL 2774610, at *10 ("[T]he presumption of constitutionality during that six-month period is rebuttable."); *Zavvar v. Scott*, No. CV 25-2104-TDC, 2025 WL 2592543, at *5–6 (D. Md. Sept. 8, 2025) (collecting cases). It did so merely to "guide" lower court determinations of whether removal is reasonably foreseeable.

11

*Munoz-Saucedo v. Pittman*, No. CV 25-2258 (CPO), 2025 WL 1750346, at \*6 (D.N.J. June 24, 2025) (quoting *Zadvydas*, 533 at 700–01).[3] *Zadvydas* unequivocally held that "once removal is no longer reasonably foreseeable, continued detention is no longer authorized." 533 U.S. at 699–700.

A detained person who brings a *Zadvydas* claim *before* the presumptively reasonable six-month period must *prove* "that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.*; *Medina*, 2025 WL 2306274, at \*6 (quoting *Munoz-Saucedo*, 2025 WL 1750346, at \*6). To make out a *Zadvydas* claim *after* the six months have run, a detained noncitizen need only "provide[] good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* at 701. If he does so, "the Government must respond with evidence sufficient to rebut that showing."

To assess the foreseeability of Petitioner's removal to a third country, it is worth considering the procedural requirements governing a noncitizen's removal to a third country. Removal proceedings determine not only whether a noncitizen may be removed from the United States but also to where he may be removed. In determining the location of removal, the law entitles the noncitizen to first voluntarily select a country of removal. *See* 8 U.S.C. § 1231(b)(2)(A)(i); 8 C.F.R. § 1240.10(f). If the noncitizen does not do so, the immigration judge will designate the country of removal and may also designate alternate countries to which the noncitizen may be removed. *See* 8 C.F.R. § 1240.10(f).[4]

---

[3] "Some courts have held that until the six-month *Zadvydas* period concludes, detention is *conclusively* reasonable—in other words, that during that period courts are precluded from inquiring at all into whether removal is reasonably foreseeable." *Medina v. Noem*, No. 25-CV-1768-ABA, 2025 WL 2306274, at \*5 (D. Md. Aug. 11, 2025) (collecting cases); *see also Chance v. Napolitano*, 453 F. App'x 535, 2011 WL 6260210 (5th Cir. 2011) (non-precedential opinion affirming a district court's finding that a challenge to post-removal detention was premature where *Zadvydas*'s six-month period had not passed); *Agyei-Kodie v. Holder*, 418 F. App'x 317, 2011 WL 891071, at \*1 (5th Cir. Mar. 15, 2011) (same). But, again, *Zadvydas*'s creation of a *presumption* and the case's actual rule—"if removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized by statute"—command against that understanding. *Zadvydas*, 533 U.S. at 699–700.

[4] The immigration judge may designate a country or countries to which the noncitizen may *not* be removed if the noncitizen proves to the court's satisfaction that the noncitizen is likely to be tortured or persecuted if removed to that

Nearly four years after he was ordered removed and a year after his re-detention, Petitioner has shown good reason to believe that there is no significant likelihood of his removal in the reasonably foreseeable future. The government observes that the "reasonably foreseeable future" standard is "fluid and country-specific, depending in large part on country conditions and diplomatic relations." ECF No. 5 at 6. But that statement essentially proves Petitioner's point— how could a Court possibly find that a detainee is likely to be removed in the "reasonably foreseeable future" based on "country conditions and diplomatic relations" if the government has not identified the country to which the detainee will be removed?

To be sure, courts have held that "[a] 'lack of visible progress' in the removal process 'does not in and of itself meet [a petitioner's] burden of showing that there is no significant likelihood of removal.'" *Ali v. Johnson*, No. 3:21-CV-00050-M (BT), 2021 WL 4897659, at *2 (N.D. Tex. Sept. 24, 2021), *adopted*, 2021 WL 4893605 (N.D. Tex. Oct. 20, 2021) (citing *Fahim v. Ashcroft*, 227 F. Supp. 2d 1359 (N.D. Ga. 2002)). But it was possible to write off delays in those cases as "the bureaucratic gears of the INS . . . slowly grinding away," because they involved *repatriation*. *See Fahim*, 227 F. Supp. 2d at 1366; *see also Ali*, 2021 WL 4897659, at *2. In other words, it was possible to see what the government was grinding *toward*. *See Fahim*, 227 F. Supp. 2d at 1366 ("[T]he mere fact that the Egyptian government has taken its time in responding to the INS request for travel documents does not mean that it will not do so in the future."); *see also Ali*, 2021 WL 4897659, at *3 ("ERO has been actively engaged in the removal process here and followed up with Indian officials to obtain Ali's travel documents."). Because Petitioner cannot be removed to

country. *See* 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 1208.16(b). In that circumstance, the government may remove the noncitizen to any third "country whose government will accept the [noncitizen] into that country." 8 U.S.C. § 1231(b)(2)(E)(vii). Still, the noncitizen may not be removed to any country in which there is reason to believe that he would be tortured or persecuted. *See* 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. §§ 208.16–.18; 8 C.F.R. §§ 1208.16–.18.

13

his country of origin and the government has not identified a country willing to accept him, this case stands on completely different ground.

To begin, there is no evidence that the government attempted to remove Petitioner during the years between his release from detention in 2022 and his re-detention in 2025 or that they have found a country to take him—the very first step in the process of removing a noncitizen to a third country. ICE has provided no evidence that any country has agreed to accept Petitioner.

ICE did not provide Petitioner with any justification for his detention and still, nearly a year later, has not offered one to the Court. Taken together, the long period of time between Petitioner's removal order and his detention, the lack of any explanation for his detention in 2025, and the government's duplicative (and unsuccessful) efforts at removal to Nepal in 2025 show that Petitioner's removal is not reasonably foreseeable. *See Villanueva*, 2025 WL 2774610, at *10 (granting petition for writ of habeas corpus based on *Zadvydas* where the government had failed to remove noncitizen for eight years following his order of removal, and there was no evidence that circumstances had changed to make removal reasonably foreseeable).

"The Court is mindful that the government has the right to enforce [Petitioners]'s Order of Removal. But the government may not detain [Petitioner] for an indefinite and undetermined period of time while it tries to effect that removal when the circumstances are such that his removal is not reasonably likely in the foreseeable future. Such an action violates the Due Process Clause, as explained in *Zadvydas*." *Id.* Thus, Petitioner must be released. *Zadvydas*, 533 U.S. at 699.

## III.    Scope of Relief

Having determined Mr. Gurung's petition is well taken, the Court considers the scope of appropriate relief based on the three factors set out by the Supreme Court in *Mathews v. Eldridge*:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural

14

safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. 319, 334–35.

Here, even if the government has the discretion to revoke Petitioner's supervision, his constitutionally protected liberty interests are implicated by his re-detention. The Supreme Court has stated that "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690. Moreover, individuals who have been conditionally released from detention have a protected interest in their "continued liberty." *Young v. Harper*, 520 U.S. 143, 147 (1997). This is true even when the released individual is subject to extensive conditions of release. *Id.* at 148; *see also Morrissey v. Brewer*, 408 U.S. 471, 482 (1972).

Petitioner has a liberty interest in his continued release under his Order of Supervision. He was free under that Order for over two years. He has a job and a family. He has complied with all of the terms of his Order of Supervision. "There is no principled reason to find that [Petitioner] does not have an overwhelming liberty interest in his continued release that may not be removed without due process." *Villanueva*, 2025 WL 2774610, at *11.

Second, "the risk of an erroneous deprivation of [Petitioner]'s rights is high. The regulations enacted by the government itself are intended to ensure that noncitizens who have been released to supervision do not arbitrarily have that supervision revoked." *Id.* By failing to follow its own regulations, the government has denied Petitioner notice of its intent to revoke his supervision, notice of the reasons for the revocation, and an opportunity to challenge those reasons. The government offers no explanation for its failure to comply with its own regulations. *Cf. id.* (noting that changes in enforcement priorities cannot be made "at the expense of individuals' due

15

process rights."). The risk of an arbitrary and erroneous deprivation under these circumstances is undeniably significant.

Third, the burden imposed on the government does not outweigh Petitioner's interests. "To be sure, the government has a weighty interest in removing deportable noncitizens, ensuring compliance with Orders of Supervision, and protecting the public. But in this case, those interests will not be impaired by requiring the government to comply with its own regulations in determining whether to revoke [Petitioner's] supervision and whether to re-detain him." *Id.* Again, the government can have no legitimate interest in ignoring its own regulations, which are intended to ensure that the discretion afforded to the government's agents is not exercised arbitrarily.[5]

Pena does not attest in her declaration that Petitioner failed to comply with his Order of Supervision or that his removal is imminent. *See* ECF No. 5-1. Further, the government identifies no factual basis to believe that Petitioner poses a danger to the public. Indeed, the government "does not identify any changed circumstances that would appear to warrant the revocation of [Petitioner]'s supervision and his re-detention without even the barest hint of due process." *Villanueva*, 2025 WL 2774610, at *11.

Having considered Mr. Gurung's petition and its attachments, the government's response and attachments, and the law, the Court finds that the balance of the factors establishes that the government violated Petitioner's due process rights by re-detaining him without complying with its own regulations and the law. The Court also finds that Petitioner's continued detention violates due process because it is not reasonably likely that he will be removed in the foreseeable future.

---

[5] Indeed, it is hard to describe the government's conduct here as anything other than arbitrary. For nearly a year, Petitioner has been deprived of his liberty, his income, and his family, while the government has engaged in duplicative, drawn-out, and fruitless efforts to remove him to a country that rejected him over three years ago because he was not then and has never been a citizen.

The only way to vindicate Petitioner's due process rights is to order his release from custody. The Court therefore grants Petitioner's petition and orders his release subject to the conditions below.

Petitioner requests attorney's fees under the Equal Access to Justice Act ("EAJA"). 28 U.S.C. § 2412(d)(1)(A). Because fees under the EAJA are not available in habeas corpus proceedings like this one, that request is denied. *Barco v. Witte*, 65 F.4th 782. (5th Cir. 2023).

## CONCLUSION

For the foregoing reasons, the Petitions for Habeas Corpus are **GRANTED**. It is **ORDERED** that:

1.      Respondents are **DIRECTED** to **RELEASE** Petitioner Bikash Gurung (A212-179-775) from custody, under conditions no more restrictive than those in place before the detention at issue in this case, to a public place by **12:00 p.m.** on **January 8, 2026**.

2.      Respondents must **NOTIFY** Petitioner's counsel by email[6] of the exact location and time of Petitioner's release as soon as practicable and **at least two hours before his release;**

3.      Respondents shall **FILE** a status report **no later than 5:00 p.m. January 8, 2026**, confirming that Petitioner has been released under conditions of release no more restrictive than those in place prior to the detention at issue in this case.

4.      Once Respondents identify a country that is willing to accept Mr. Gurung, they must **NOTIFY** him and his counsel of the country to which it intends to remove Mr. Gurung with sufficient time for him to object, if necessary; and

5.      Petitioner's Motion for a Temporary Restraining Order (ECF No. 2) in the **Member Case (No. SA-25-CV-1739-XR)** is **DENIED AS MOOT**.

---

[6]Georgia Santos Laurent, georgia@sanlaurentlaw.com, (786) 781-0781.

The Clerk is **DIRECTED** to **CLOSE** the **Lead Case (No. SA-25-CV-1614-XR)** and the **Member Case (No. SA-25-CV-1739-XR)**. A final judgment in each case will issue separately.

It is so **ORDERED**.

**SIGNED** this 6th day of January, 2026.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

18